UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| SUN LIFE ASSURANCE COMPANY OF CANADA, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No.: 3:14-cv-00539<br>)         REEVES/GUYTON |
| CONESTOGA TRUST SERVICES, LLC, As Trustee of Conestoga Settlement Trust, | )<br>)<br>) |
| Defendant. | ) |

# MEMORANDUM OPINION

This case concerns a life insurance policy issued by Sun Life Assurance Company of Canada on the life of Erwin Collins. Sun Life filed this action seeking a declaration that the policy is void due to having been procured as a wagering contract on the life of Collins. Sun Life contends the policy is a "stranger originated life insurance (STOLI)" policy, wherein investors utilized Collins' life as a conduit to procure the policy, wager on his life, and profit from his death. Therefore, Sun Life argues Conestoga has no right to recover proceeds from the life insurance policy because the policy is void *ab initio*.

Defendant, Conestoga Trust Services, LLC, is the sixth assignee of the ownership rights in the policy. Conestoga responds there is no evidence that "stranger investors" procured the policy, and it is permissible to take out a life insurance policy with the hope of trying to sell the policy on the secondary market. In the event the court declares the Sun

Life policy void, Conestoga asserts Sun Life must return to Conestoga the premiums paid to Sun Life.

For the reasons that follow, the court finds there was a pre-existing agreement for Erwin Collins to obtain the policy and transfer it to a stranger investor. Therefore, the policy constitutes a STOLI scheme, and under Tennessee law, it violates public policy and is void *ab initio*. As a result, Sun Life does not have to pay the death benefit to Conestoga. However, Sun Life must refund the premiums to Conestoga so that Sun Life does not obtain a windfall.

Prior to discussing the motions for summary judgment, the court will address Conestoga's motion to amend and Sun Life's motion to strike.

## I. Motion to Amend

Conestoga moves to amend its answer and counter-complaint to include an alternative claim for bad faith under Tennessee law, and an alternative claim for return of premiums paid by Conestoga to Sun Life [R. 71]. Sun Life opposes the motion as untimely, futile, and delaying the proceedings [R. 82].

Pursuant to Federal Rule of Civil Procedure 15(a)(2), a party may amend its pleading only with the opposing party's written consent or the court's leave. Although the decision to permit amendment of pleadings is committed to the discretion of the court, the court's discretion is limited by Rule 15(a)'s liberal policy of permitting amendments to ensure the determination of claims on their merits. *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987). Because Rule 15(a) envisions liberal allowance of amendments to pleadings, there must be some substantial reason justifying denial of the motion. *Smith v.*

2

*Garden Way, Inc.*, 821 F.Supp. 1486, 1488 n. 2 (N.D.Ga. 1993). In evaluating the interests of justice, courts typically consider whether the amendment is brought in bad faith or for dilatory purposes, would result in undue delay or prejudice to the opposing party, or would be futile. *Graham v. Luttrell*, 191 F.3d 452 (6th Cir. 1999).

Here, Conestoga's motion to amend is timely under the court's order extending the trial date and all associated pretrial deadlines. *See* R. 37. Further, the court finds the proposed amendments will cause Sun Life no prejudice or delay because the parties' summary judgment filings already address the claims for bad faith penalty and for return of premiums. Accordingly, in the interests of justice and pursuant to Rule 15(a), Conestoga's motion to file an amended answer and counter-complaint [R. 71] is **GRANTED.**

## II. Motion to Strike

Following the close of briefing on the parties' cross-motions for summary judgment, Sun Life filed a notice of supplemental authority to apprise the court of a development in one of the cases cited in Sun Life's brief [R. 107]. Conestoga filed its own notice of supplemental authority that included argument regarding the relevance of Sun Life's supplemental authority and Conestoga's supplemental authority [R. 108]. Sun Life, in turn, filed a motion to strike Conestoga's notice of supplemental authority on the grounds Conestoga was attempting to expand on its previous arguments [R. 109]. Conestoga filed a response to Sun Life's motion to strike arguing that Conestoga merely responded to Sun Life's characterization of the supplemental authority [R. 110].

The court appreciates the parties providing notice of supplemental authority decided since the close of briefing. However, the court will decide for itself whether the cited authority is relevant to the issues in this case. Accordingly, the court finds no merit to Sun Life's motion to strike [R. 109], and the motion is **DENIED.**

The court will now address the parties' motions for summary judgment.

### III.  Motions for Summary Judgment

**A.  Standard of Review**

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.,* 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

**B. Background**

Eugene Houchins[1] was an insurance broker who sold life insurance policies. Houchins was also President of Bonded Life Company, an entity he used to procure life insurance policies. Houchins approached Robert and Nicole Coppock asking whether the Coppocks were interested in earning fees by referring persons to him for a program where they would earn money through life insurance policies taken out on the lives of elderly persons. Under a written agreement, Mr. Coppock was retained as Bonded Life's agent. Pursuant to this agreement, Bonded Life paid the Coppocks a referral fee of 20% of the first year premium on any completed transaction. As part of this arrangement, the Coppocks referred Erwin Collins to Houchins.

---

[1] At his deposition in this case, Houchins declined to answer questions, asserting a Fifth Amendment right to do so. Facts regarding Houchins' actions in this matter have been taken from the record and testimony of other parties/witnesses.

Houchins worked with David Wolff, whose business (Iron Core Capital) brokered the acquisition of beneficial interests in life insurance policies on behalf of Life Asset. Life Asset would acquire a beneficial interest in exchange for payment of a percentage of the face amount of the policy and reimbursement of any premiums paid on the policy before acquisition. When an acquisition closed, Houchins compensated Wolff for his services by paying him a portion of the insurance commissions received.

On September 25, 2007, Houchins submitted an informal inquiry to Sun Life to determine if Erwin Collins was healthy enough to qualify for a Sun Life policy. On October 4, 2007, Sun Life responded with a tentative offer for a policy on Collins' life, subject to submission of a formal application and full underwriting.

On November 1, 2007, Houchins wrote Wolff and provided information necessary for Life Asset to evaluate the prospective policy, including Collins' age and estimated life expectancy. Wolff testified that a life expectancy projection would allow the Fund to make a valuation of the policy.

On November 5, 2007, a formal application for a Sun Life policy was signed in Knoxville, Tennessee by Collins' wife, as trustee of the Erwin A. Collins Irrevocable Life Insurance Trust. The trust named Mr. Collins as the grantor; Mrs. Collins as the trustee; and listed their address in Knoxville, Tennessee. Between January 31 and February 8, 2008, the application and supporting documentation were submitted to Sun Life.

On February 26 or 27, 2008, Life Asset informed Wolff that it would not acquire a beneficial interest in a policy on Collins' life because the transaction was connected to Tennessee. Tennessee was one of a number of states where Life Asset would not conduct

6

business. Houchins then had a different trust, with a Georgia address, reapply for a policy with Sun Life. The new application, which was dated March 31, 2008, was purportedly signed in Tucker, Georgia by Erwin Collins as the insured, Ms. Gordillo (friend of Houchins) as trustee of the trust, and Houchins' father as the broker/registered representative. Houchins controlled the Georgia trust with his friend Gordillo as trustee, as the policy applicant, and proposed owner. Houchins removed any references to Tennessee from the policy application and trust documents, including using a false Georgia address as the residence of the Collins and having their signatures falsely notarized in Georgia by his employee.

On March 17, 2008, Houchins sent an email to Wolff informing him that the Tennessee problem had been resolved and that the policy transaction was "now on Georgia paper." Houchins asked Wolff to have Life Asset price the policy. On March 18, 2008, Wolff forwarded life expectancy reports and a policy illustration provided by Houchins to Life Asset. A week later, Life Asset priced the policy at 4% of its $2 Million face amount ($80,000). Wolff communicated Life Asset's 4% price to Houchins.

On April 3, 2008, four weeks before the policy was issued, Houchins informed Wolff that Mrs. Collins would sell her beneficial interest in the trust at 4% of face amount Life Asset had quoted. In his April 3, 2008 email, Houchins stated: "Collins (SUN) – is being re-issued in GA. We will then close with you at 4%."

On April 5, 2008, Wolff informed Houchins of the closing requirements for Life Asset's acquisition. Wolff also provided Houchins with the sales contract documents for Mrs. Collins to sign. With the arrangements in place to sell the beneficial interest,

7

Houchins paid the $27,000 initial premium to place the policy in force. The premium was paid by two cashier's checks payable to Sun Life issued by the Bank of America branch in Dunwoody, Georgia – check number 0897264 was issued on April 22, 2008 for $19,580, and check number 08997265 was issued on April 25, 2008 for $7,420. Houchins funded these checks using funds from Bonded Life's bank account payable to Sun Life in the trust's name. After receiving the premium payment, Sun Life issued the policy on April 30, 2008.

The closing documents for the acquisition of Mrs. Collins' beneficial interest contained no references to Tennessee and, instead, stated that the Collins resided in Georgia and that all documents had been signed by Mr. and Mrs. Collins in Georgia. Houchins forwarded the signature pages for the contract documents to the Collins in Tennessee, on May 5, 2008, and returned the signed documents to Wolff on May 9, 2008.[2] Regarding the Georgia trust and application – Mrs. Collins testified that she and Mr. Collins resided in Tennessee; they had a winter home in Florida; they never lived in Georgia; and neither of them ever signed any documents in Georgia.

Life Asset acquired the beneficial interest in the trust for 4% of the face amount of the policy ($80,000) plus a reimbursement of premiums paid ($27,000) – a total of $107,000. Houchins received $47,000 and Mrs. Collins received $60,000. Houchins' father also received commissions from Sun Life in the amount of $62,605.35. The Coppocks and Wolff were compensated by Houchins for facilitating the transaction.

---

[2] For some reason not revealed in discovery, the contract documents had to be resigned on June 9, 2008.

Conestoga Trust Services, LLC, is the sixth assignee of the ownership rights in the policy, acquiring its interest on April 30, 2013. Erwin Collins passed away on June 19, 2014. On August 13, 2014, Conestoga submitted a death claim to Sun Life for the proceeds of the policy.

Sun Life avers that the policy was at all times meant by the applicants as an illegal wager on the life of Collins. Sun Life further avers that the Collins Trust was itself an illegal sham created to give the false appearance of a valid insurance trust and thus, a legitimate insurable interest in the life of Erwin Collins. Sun Life further avers that the source of the funds for the initial premium payment on the policy was not Collins or any person possessing an insurable interest in his life. Instead, the premiums were paid by persons or entities who were wagering on Mr. Collins' death so they could collect the $2 Million death benefit.

## IV. Analysis

### A. STOLI SCHEME

In a STOLI scheme, stranger investors wager on the life of elderly individuals by procuring high dollar insurance policies on their lives. The death benefits are not payable to the insureds' families or loved ones, but to the investors, who have no insurable interest in the insureds' lives, and who wager that the insureds will die as soon as possible so the death benefits can be obtained with the least possible outlay of premiums, thus maximizing their returns. The Eleventh Circuit described the scheme as follows:

> A STOLI policy is a speculative investment device that entails gambling on the lives of the elderly. In its purest form, a STOLI transaction works like this: A speculator secures an agreement with a person, who is usually

9

elderly, authorizing the speculator to buy insurance on that person's life. The speculator usually gets the policy in the largest amount available and pays the premiums, hoping to profit in one of two ways. One way is if the insured dies before the premiums paid exceed the death benefit. Under that scenario the sooner the insured dies, the fewer the premium payments that are necessary to obtain the payout, and the greater the return on investment. The other way the speculator can profit is by selling the policy to another speculator for more than the premiums paid up to the point of that sale.

*Sciarretta v. Lincoln Nat. Life Ins. Co.,* 778 F.3d 1205, 1207-08 (11th Cir. 2015).

Tennessee prohibits STOLI policies through both statutory and common law.[3] Since 1799, wagering contracts have been held void under Tennessee law. *See* Tenn. Code Ann. § 2919-101 ("All contracts founded, in whole or in part, on a gambling or wagering consideration, shall be void to the extent of such consideration"). Consistent with this prohibition, the Tennessee legislature adopted an insurable interest requirement for insurance policies to prevent wagering contracts. See Tenn. Code Ann. § 56-7-101 ("A contract of insurance is an agreement by which one party, for a consideration, promises to pay money or its equivalent, or to do some act of value to the assured, upon the destruction or injury, loss or damage of something in which the other party has an insurable interest"). Tennessee's insurable interest requirement serves the substantive goal of preventing speculation on human life by ensuring that a life insurance policy cannot be procured unless the person procuring it has an interest in the continued life, health, and bodily safety of the person insured.

---

[3] Consistent with the common law, the Tennessee Legislature addressed the illegality of STOLI when it adopted the Viatical Settlement Act of 2009. Although the Act does not apply to the Sun Life policy because the Act was enacted after the policy transaction, the Act is instructive. The Act prohibits "entering into any agreement or undertaking any act or plan that involves stranger-originated life insurance." Tenn. Code Ann. § 56-50-102(6)(A(iii). The Act defines STOLI as "a practice or an act to initiate a life insurance policy for the benefit of a third-party investor who, at the time of policy origination, has no insurable interest in the insured." Tenn. Code Ann. § 56-50-102(12)(A).

10

Important to the instant discussion, Tennessee courts have held for over one hundred years that life insurance taken out as a wager is void. See *Clement v. New York Life Ins. Co., Id.* 46 S.W. 561 (Tenn. 1898); *Marquet v. Aetna life Ins. Co.*, 159 S.W. 733, 735 (Tenn. 1991) ("The rule is well established that a lack of insurable interest by the beneficiary in the life of the insured, where the insurance is taken out and paid for by the beneficiary as a speculation, vitiates the contract . . . All such contracts are wagering pure and simple").

Typically, the prospective insured acts as a nominal grantor of a life insurance trust that is used to apply for the policy. Where a policy is procured through the use of a trust, the insured must create and fund that trust in order to satisfy the insurance interest requirement. There is no insurable interest if a policy is procured as a cover for the wager. *See PHL Variable Ins. Co. v. Price Dawe*, 28 A.3d 1059, 1075 (Del. 2011).[4] When analyzing whether such a procurement is a cover, courts scrutinize the circumstances under which the policy was issued and determine who in fact procured or affected the policy. *Id.* at 1076. *Price Dawe* noted one telltale sign of such a scheme – "If a third party funds the premium payments by providing the insured the financial means to purchase the policy then the insured does not procure or affect the policy." *Id.* at 1076.

The court has scrutinized the circumstances under which the Sun Life policy issued and finds the undisputed facts support the conclusion Houchins improperly used Erwin Collins as a conduit to acquire a policy that Life Asset could not otherwise acquire. Life

---

[4] The Tennessee Viatical Settlement Act of 2009 states, consistent with the common law, that trusts created to give the appearance of an insurable interest, and used to initiate policies for investors, violate insurable interest laws and the prohibition against wagering on life. Tenn. Code Ann. § 56-50-102(12)(B).

11

Asset priced the purchase of the beneficial interest at 4% of the face value of the policy plus reimbursement of the premiums paid for a total of $107,000 prior to the issuance of the policy. After confirming that Mrs. Collins would sell her beneficial interest for this price, Houchins paid and funded the initial premiums required to place the policy in force. When Life Asset closed on the acquisition, right after the policy was issued, Houchins was reimbursed from the sales proceeds for the premiums paid by his company. Life Asset acquired the beneficial interest in accordance with terms that were previously agreed upon, and the participants in the transaction (Houchins, Wolff, the Coppocks, and Mrs. Collins) were compensated for their roles in procuring the policy. Conestoga has presented no evidence that Mr. Collins or any other person with an insurable interest in his life funded any of the premiums paid on the policy. *See Price Dawe*, 28 A.3d at 1078 (a policy fails at its inception for lack of an insurable interest where a third party either directly or indirectly funds the premium payments as part of a pre-negotiated arrangement with the insured to immediately transfer ownership).

Contrary to Conestoga's argument, the policy is not supported by an insurable interest because the policy was "at least nominally issued" to a trust with Mrs. Collins as the beneficiary. Where a policy is procured through a trust, the insured must create and fund that trust in order to satisfy the insurable interest requirement. *Price Dawe*, 28 A.3d at 1076. Here, the Georgia trust lacked an insurable interest in Collins' life. Although Mr. Collins was listed as the nominal settlor of the Trust, he did not fund the trust or pay any premiums on the policy. The Trustee, Gordillo, testified the trust never had any money, did not pay any premiums on the policy, nor did she know the source of funds for any

premium payments. Instead, the record shows premiums were paid by Houchins through his Bonded Life account. Under Tennessee law, a policy must be taken out in "good faith" and the rule is that if one procures a policy upon the life of another and pays the premiums, that party "must have an insurable interest in the life of that other, or the policy will be a mere wager policy." *Clement,* 46 S.W. at 561; *Sun Life v. Wells Fargo*, 2016 WL 5746352 at *11 (D.N.J. Sept. 30, 2016) (holding that policy was void *ab initio* as a wagering contract where the investors funded the premium by funneling the money through the trust account).[5]

Conestoga argues the policy is not void merely because Houchins advanced the money for the premium, characterizing the payment as a "loan." In determining whether a transaction is a loan, the Sixth Circuit instructs courts to examine certain "objective criteria" that are "normally associated with legitimate debts," including an unconditional promise to repay, a fixed maturity date, an interest rate, and a schedule for payment of principal and interest. *Executive Jet Aviation, Inc. v. United States*, 507 F.2d 508, 512 (6th Cir. 1974).

Here, the record is devoid of any evidence that Erwin Collins knew that Houchins made the premium payments. In addition, the trustee and Mrs. Collins both testified they had no knowledge whatsoever about the premium payments. They did not know whether

---

[5] The Tennessee Viatical Settlement Act of 2009 is instructive as to Tennessee law. Consistent with the common law, it defines STOLI to include "cases in which life insurance is purchased with resources . . . from or through a person or entity that, at the time of the policy's inception, could not lawfully initiate the policy . . . and where, at the time of the policy's inception, there is an arrangement or agreement, whether verbal or written, to directly or indirectly transfer the ownership of the policy or the policy benefits to a third party." Tenn. Code Ann. § 56-50-102(12)(B).

any premiums had been paid; who paid the premiums; or the source of the funds for any premium payments. Moreover, there is no loan documentation and no evidence of any repayment terms – no interest rate, no repayment date, and no payment schedule. When the Life Asset acquisition closed, the trustee testified there were no loans to the trust in connection with the policy. Therefore, the court finds Conestoga's argument that the premium payment was a "loan" is without merit.

Conestoga next argues it is an "innocent bona fide assignee" under the policy. However, the Tennessee Supreme Court held in *Clement,* "the transfer and assignment must be in good faith, and not as a mere colorable evasion of the provision in regard to wagering contracts, and in order to validate or legalize the same." *Id.* 46 S.W. at 564; *see also Aetna Life Ins. Co. v. Hooker,* 62 F.2d 805 (6th Cir. 1933) ("The mere fact that an issued policy may be validly assigned to one not having an insurable interest has no legal significance in determining whether the policy was initially procured by one without such insurable interest"); *Volunteer State Life Ins. Co. v. Pioneer Bank,* 327 S.W.2d 59, 64-65 (Tenn.Ct.App. 1959) ("In this State, both at common law and by statute, a policy of life insurance is an assignable instrument and, when not forbidden by the policy itself, or otherwise, it may be assigned, in the absence of fraud or a wagering contract"). Thus, Tennessee law holds that a transferee's innocence or good faith will not revive a contract void from inception as an illegal wagering contract. *Clement*, 46 S.W. at 595. An assignor cannot transfer to his assignee any greater rights in the contract than the assignor possesses under the contract. *Tenn. Ins. Guar. Ass'n v. Century Ins. Co.,* 2005 WL 1384878 at *7 (Tenn.Ct.App. June 10, 2005) (citing *Kennedy v. Woolfolk*, 4 Tenn. 195 (1817). Once the

policy has been tainted as a wagering contract, subsequent assignees take no greater rights in the policy than the initial wagerer, and the law will not permit that illegal and void contract to become valid and enforceable by virtue of a subsequent transfer. Accordingly, the court finds Conestoga's argument that it is an "innocent bona fide assignee" under the policy without merit.

**B. Return of Premiums**

Having determined that there was no insurable interest at the inception of the policy, the court turns to Conestoga's request that Sun Life be directed to return all premium payments paid by Conestoga for the policy. Sun Life moves to dismiss this claim on the grounds that the policy is void *ab initio* and, therefore, the court should leave the parties where it found them. In addition, Sun Life argues it would not be unjustly enriched by retaining the premiums. As a result of this STOLI transaction, Sun Life has incurred substantial policy expenses including $62,605.35 in commissions, additional expenses related to policy underwriting and administrating, and legal expenses incurred in this action.

Tennessee follows the majority rule that an assignee who has paid premiums in good faith is entitled to recover premiums paid if the policy is later declared void because of the misconduct of others. See *Washington v. Atlanta Life Ins. Co.*, 136 S.W.2d 493 (Tenn. 1940); *Branson v. Nat'l Life & Acc. Ins. Co.*, 1927 WL 2089 (Tenn.Ct.App. 1927). As stated in *U.S. Bank Nat'l v. Sun Life Assur. Co. of Canada*, "an insurance company cannot have it both ways" by obtaining rescission of a life insurance policy and simultaneously retaining the premiums paid on the policy. *Id*, 2017 WL 347449 at *19 (E.D.N.Y. Jan. 24,

2017). The court agrees. Conestoga is not to blame for the fraud here; it merely acquired a life insurance policy from a predecessor assignee and that policy turned out to be void. Allowing Sun Life to retain the premiums would be a windfall to the company. *See Branson*, 1927 WL 2089 at *3 (assignee of the policy who in good faith paid premiums entitled to recover premiums paid); *Washington*, 136 S.W.2d at 494 ("The contract of insurance is a conditional one. If no risk attaches, no premium, in the absence of fraud, is earned. When the risk never attached, and no risk was ever run, the premium is to be returned"). Accordingly, Conestoga's motion to recover its premium payments is **GRANTED**. Conestoga will be limited to return of premiums paid after acquiring the ownership rights in the policy (April 30, 2013).

### C. Bad Faith Claim

In light of the court's finding that the policy at issue is void as an illegal wagering contract, Conestoga has no viable bad faith claim. The record establishes that there was a reasonable basis for Sun Life's challenge to the validity of the policy. The law is clear that there is no viable bad faith claim where the insurer's refusal to pay rests on legitimate and substantial legal grounds. *Tyber v. Great Central Ins. Co.*, 572 F.2d 562, 564 (6th Cir. 1978).

The court finds that the record evidence demonstrates that the policy lacked an insurable interest at its inception and is therefore void *ab initio* under Tennessee law.

## V. Conclusion

In light of the foregoing discussion:

1. Conestoga's motion for leave to file amended answer and counter-complaint [R. 71] is **GRANTED.**

2. Sun Life's motion to strike [R. 109] is **DENIED.**

3. Sun Life's motion for summary judgment [R. 74] is **GRANTED in part.** The Sun Life policy on the life of Erwin Collins is declared void *ab initio* and Sun Life does not have to pay the death benefit to Conestoga.

4. Conestoga's motion for refund of the premiums paid to Sun Life [R. 72] is **GRANTED**. Sun Life shall refund only the premium payments made by Conestoga. In all other respects, Conestoga's motion for summary judgment is **DENIED**.

Enter:

_____
**UNITED STATES DISTRICT JUDGE**